S. E. Lane v. Community Natural Gas Company.

No. 7195. Decided January 18, 1939.
Rehearing overruled April 26, 1939.
(123 S. W., 2d Series, 639.)

*Ned Elnor Moore* and *DeWitt Bowmer,* of Temple, for plaintiff in error.

It was error for the Court of Civil Appeals to hold that no duty rested upon the gas company to inspect the premises of a non-subscriber for gas, when said company knew that said premises had been equipped for gas at the time it turned gas into an adjoining apartment. San Antonio Gas & Elec. Co. v. Ocon, 105 Texas 139, 146 S. W. 164; Fort Worth Gas Co. v. Cooper, 241 S. W. 282.

*Cox & Brown,* of Temple, *Pinkney Grissom,* and *Thompson, Knight, Baker & Harris,* all of Dallas, for defendant in error.

No duty rested upon the gas company to inspect plaintiff's premises before turning the gas into an adjoining apartment. Huddleston v. Dallas Power & Light Co., 93 S. W. (2d) 199; Triplett v. Alabama Power Co. 213 Ala. 190, 104 So. 248; Lone Star Gas Co. v. Eckle, 110 S. W. (2d) 936.

MR. JUSTICE SHARP delivered the opinion of the Court.

On February 12, 1933, the wife of S. E. Lane died as a result of injuries received in a gas explosion, which had occurred the previous afternoon in the kitchen of her apartment

in Belton, Texas. Plaintiff alleged negligence against the defendant in permitting its gas to flow through unsafe equipment in the Lane apartment. The case was submitted to the jury on special issues, and by virtue of the jury's answers to such issues the trial court entered judgment in favor of the plaintiff against the defendant. The case was appealed to the Court of Civil Appeals, and the judgment of the trial court was reversed and the cause rendered in favor of the defendant. 97 S. W. (2d) 703. A writ of error was granted.

Plaintiff in error contends that the Court of Civil Appeals erred in reversing and rendering this cause on the holding that a gas company is under no duty to make any character of inspection in an apartment house occupied by two families, one of which is a nonsubscriber of gas, where such gas company knew both apartments to be piped and equipped for gas at the time it turned its gas into one of the apartments.

The testimony relating to certain facts is conflicting, and since the jury has passed upon such testimony and found in favor of plaintiff in error, we will not set out in detail all of the testimony, but will state only the salient facts, which are as follows: The house in which plaintiff in error and his wife resided was originally a single residence and was owned by W. A. Gilmer. Several years before the accident, Gilmer had such residence converted into two apartments, facing east, which were designated and referred to as the "north" and "south" apartments; and each apartment was, for a time thereafter, supplied with gas through separate meters stationed at the front of the building near the sidewalk. The house had but one bathroom, which was used by the tenants of both apartments. Said bathroom was situated in the south apartment. Sometime after, said house was converted into a duplex, and while said apartments were being supplied from two separate meters, the owner thereof, W. A. Gilmer, employed a plumber to install in said house a by-pass which connected the two gas pipe systems to said apartments. This by-pass tapped the bathroom heater line between the heater and the cutoff, and was supplied with its own cutoff. It extended under the bathroom and over to and connected with the north apartment system of gas pipes. This arrangement was made in order that the tenant in each apartment, when using the bathroom, might heat the bath water by means of gas through the system of pipe supplying his side of the house, and connecting with his separate meter.

Following the installation of this arrangement of piping,

the tenant then occupying said apartments moved therefrom in August, 1931, and the defendant in error removed its two meters from in front of said dwelling. Both apartments remained vacant for some time. In the latter part of June, 1932, plaintiff in error and his wife moved into the north apartment. They did not subscribe for natural gas from the defendant in error, and were not using natural gas; each being unfamiliar with the use and behavior of this commodity, and unfamiliar with gas plumbing and fittings. In November of said year plaintiff in error and his wife were out of town and away from their apartment for a few weeks. When they returned, on Thanksgiving Day, 1932, they found that the south apartment was no longer vacant, but was occupied by Mrs. Hargrove and her young daughter. When Mrs. Hargrove moved into the south apartment, she applied to defendant in error for a gas meter to be installed, her cook stove connected, and gas turned into the south apartment. Upon such application, J. E. Hill, agent and employee of the defendant in error, installed a meter at the south apartment, installed the cook stove of Mrs. Hargrove, and, according to his own testimony, turned the gas on, without any inspection or observation whatever. No inspection was made of piping or fittings inside the building.

The facts further show that the agent of defendant in error knew at the time he turned the gas into the south apartment that the north apartment was occupied by tenants, who had not applied for natural gas; that he knew that Mrs. Hargrove and her daughter were to be the only occupants of the south apartment, and knew that they were not responsible persons with reference to knowledge of gas, plumbing, fittings, etc. Said agent further testified that natural gas is a silent, invisible, dangerous, and explosive substance, somewhat mysterious in its composition and behavior. The facts further show that Mrs. Hargrove had complained to said agent, Hill, that the gas range, when in operation, gave off odors; and she was informed by such agent that this was due to the fact that the burners did not effect a complete combustion of the gas. Nothing was done to correct this.

The by-pass that connected the systems of pipes in the north and south apartments was complex, in that the same contained globe valves, jets, cutoffs, and other appliances above the floor in the bathroom. The system, while understandable to an experienced plumber or gas fitter, was complex and incomprehensible to an ordinary person. As the agent of the defendant in error, Hill, expressed it: "It was a tangled-up affair." It was shown that the cutoffs used in said bathroom on

the gas pipes were globe valves, which were designed and made for water cutoffs. It was further shown that said valves sometimes did not close securely, and that they were not the modern safe equipment used as gas cutoffs. It was also shown that the meter test used by the agent of defendant in error in testing the pipes when he turned the gas on in the Hargrove apartment did not always properly record the true situation.

The testimony further shows that plaintiff in error's wife assisted him downtown in the fruit and produce business, staying in said place of business during the daytime while the plaintiff in error was away buying products. On February 11, 1933, Mrs. Lane returned to her home from her work downtown in the late afternoon. Stopping in the Hargrove apartment, she conversed with Mrs. Hargrove and guests for a few minutes and departed from said apartment to her own apartment with the statement that she would prepare supper. Immediately after she entered her own apartment a violent explosion took place in her kitchen, setting fire to her clothing and inflicting wounds from which she died the following day. Following the explosion, which wrecked the entire north apartment, it was found that a gas flame was burning from an uncapped gas pipe in the Lane kitchen. Said gas pipe was situated near an oil stove which was used by Mrs. Lane in preparing meals. The plaintiff in error testified that he had never seen a cap on said pipe while he resided in said apartment. The evidence tends to show that an experienced plumber or gas fitter, upon entering the bathroom of said apartments and seeing the gas cutoffs, cocks, and valves situated therein, which were in plain and open view, would have had it suggested to him that said bathroom was supplied by gas through pipes from two different directions or systems. An investigation following the explosion disclosed that the flame from the uncapped pipe in the Lane kitchen was fed by natural gas flowing from the south apartment into the by-pass and on into the piping in the north apartment. It was further shown that the defendant in error did not require its consumers to have changes in their gas piping system made by its employees, but that the same could be made by plumbers other than those in the employ of the defendant in error, without notice to said company.

The trial court submitted certain issues to the jury. Affirmative answers were made by the jury to the following questions:

"Do you find from a preponderance of the evidence that

when defendant Gas Company turned its gas into the apartment of Mrs. Hargrove in October, 1932, the same was so piped and the connections and appliances so fixed and placed therein that gas could escape through them into the apartment occupied by plaintiff Lane and his wife?"

"Do you find from a preponderance of the evidence that at the time the gas was turned into the apartment of Mrs. Hargrove in October, 1932, the employees and agents of the defendant, by a proper inspection of the gas pipes, connections and other fixtures in said apartment, could have discovered that gas turned into said Hargrove apartment could escape through said pipes, connections and fixtures into the apartment occupied by plaintiff and his wife?"

"Do you find from a preponderance of the evidence that such failure, if any, of the defendant, through its employees and agents, to make a proper inspection of the pipes, connections and other gas fixtures as referred to in Special Issue No. 4, was negligence, as that term has been defined to you above?"

"Do you find from a preponderance of the evidence that such failure, if any, of the defendant, through its employees and agents, to make a proper inspection of the pipes, connections and other gas fixtures, as referred to in Special Issue No. 4, was a proximate cause of the death of Mrs. Emma Lane, as the phrase 'Proximate Cause' has been defined to you above?"

Negative answers were made by the jury to the following issues:

"Do you find that the defendant, through its employees and agents, before turning its gas into the apartment of Mrs. Hargrove in October, 1932, made a proper inspection of the pipes, connections and other fixtures in said Hargrove apartment?"

"Do you find from a preponderance of the evidence that some person or persons unknown to the defendant, either by turning the stop valve on the piping in the bathroom of the house in question, or by some other act, caused defendant's gas to escape from the Hargrove apartment into plaintiff's apartment on February 11, 1933, and prior to the explosion in question herein?"

■ Under the state of this record the Court of Civil Appeals held, as a matter of law, that the defendant in error was not liable for the explosion of the gas and the injuries sustained by plaintiff in error's wife. This holding gives this Court jurisdiction to review the evidence, in order to ascertain if there is any evidence of probative force to sustain the findings of the jury and the judgment of the trial court. First

State Bank v. The Metropolitan Casualty Ins. Co., 125 Texas 113, 79 S. W. (2d) 835, and cases cited.

■ Within the last few years gas, like electricity, has been commonly used for many purposes. That it is a powerful and dangerous force, has certain well known characteristics, and requires care on the part of those who furnish it, is unquestioned. In this instance the agents of defendant in error furnished gas for consumption to Mrs. Hargrove in one of the apartments, and at the same time had knowledge that the other apartment was occupied by other persons, and had knowledge of the pipes and cutoffs, or could have known about same by the exercise of that degree of care which the circumstances demanded. With this knowledge, defendant in error certainly could not entirely ignore the safety and welfare of those occupying the other part of the residence, by cutting in gas for use in one apartment and not exercising some degree of care to protect those in the other apartment. In such case the duty rested upon defendant in error, in cutting in the gas in one apartment, to exercise that degree of care, to protect those occupying the other apartment from injury, commensurate with the dangers incident to the use of such gas. San Antonio Gas & Elec. Co. v. Ocon, 105 Texas 139, 146 S. W. 162, 39 L. R. A. N. S. 1046; Sawyer v. Southern Calif. Gas Co. 206 Calif. 366, 274 Pac. 544; Lynchburg Gas Co. v. Sale, 160 Va. 783, 169 S. E. 577; Neglia v. Chadorow, 227 App. Div. 200, 237 N. Y. Supp. 81; Coleman v. Columbus Gas & Fuel Co., 40 Ohio App. 534, 179 N. E. 749; Schmeer v. Gas Light Co., 147 N. Y. 529, 42 N. E. 202, 30 L. R. A. 653; Christo v. Macon Gas Co., 18 Ga. App. 454, 89 S. E. 532; Hayes v. Cohoes Gas Light Co., 183 App. Div. 182, 170 N. Y. S. 312; 28 C. J., sec. 59, pp. 594, 595. For annotations of the cases relating to the liability of a gas company for escaping gas, see 25 A. L. R. 262, 29 A. L. R. 1250, and 90 A. L. R. 1089.

■ What was said by this Court in the case of San Antonio Gas & Elec. Co. v. Ocon, supra, in discussing the duty of those using electricity, may aptly be applied to those who sell gas. Therein it was said: " ' * * * and one who uses it for profit is bound to exercise care corresponding to the dangers incident to its use.' Howe v. Taylorville Elec. Co., 213 Ill. 318, 72 N. E. 711; McLaughlin v. Louisville Elec. Co., 100 Ky. 173, 37 S. W. 851, 34 L. R. A. 812; Cooley on Torts, 1492."

In 29 A. L. R., 1250, the general rule describing the degree of care to be used by those who furnish gas is expressed in

the following language: "A gas company, since it is dealing with a highly dangerous substance, is bound to use a degree of care commensurate with the danger of its gas escaping and causing injury or damage to the person or property of others. In the absence of contributory negligence, recovery may be had against a gas company for failure to use such care."

In 28 C. J., sec. 59, p. 594, it is said: "The general rule requiring the use of ordinary care and diligence on the part of a gas company applies to its delivery of gas into the residence or other building of the consumer. The rule has been laid down, however, that, in the absence of any fact upon which to base an inference of duty, the failure of a gas company, on introducing gas into a dwelling upon application, to inspect pipes or fixtures which were placed therein by the owner and over which the company has no control, is not negligence."

■ The rule is also generally accepted that, to render a gas company liable, there must be facts which show that the company had notice of defects in the pipes through which gas flows, or such facts from which an inference of duty to inspect arises, in order to impose liability on such company for an explosion. 28 C. J., sec. 59, p. 594. However, the following well recognized exception is noted: "A distinction has been drawn in this respect between the duty owed to an applicant for gas, and the duty, when supplying gas to an applicant, to protect other tenants in the same building, who have not applied for it. With respect to such tenants, it has been held that the company must use reasonable precautions to ascertain that the pipes in the building are in such condition that gas will not flow into their apartments to their injury; and in such a case the company cannot deny its liability on the ground that it had no right to enter upon the premises of the parties not applying for gas for the purpose of making an inspection of the pipes therein." 28 C. J., sec. 59 p. 594, and cases cited in notes.

■ We have carefully considered this record, and think the evidence raised the issues above discussed, and that the Court of Civil Appeals erred in holding, as a matter of law, that no liability existed against defendant in error, and in reversing and rendering the cause. There are other assignments raised; and, since the Court of Civil Appeals did not pass on same, the opinion of the Court of Civil Appeals will be reversed and the

cause will be remanded to that court for further proceedings on the questions not heretofore determined by it.

Opinion delivered January 18, 1939.

Rehearing overruled April 26, 1939.